IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

ALI-HAIDER KHAN,

      Defendant.

CRIMINAL ACTION NO.

1:17-cr-40-SCJ-CMS

## FINAL REPORT AND RECOMMENDATION

This case is before the Court on Defendant Ali-Haider Khan's Motion to Suppress the November 9, 2015 Traffic Stop [Doc. 20] and Motion to Suppress the Warrantless Search [Doc. 21].  These motions focus on the November 9, 2015 traffic stop and subsequent search of Defendant's car that led to the discovery of three boxes of synthetic marijuana.  Defendant challenges the admission of all evidence arising from the stop and search of Defendant's car, arguing that the stop and search violate the United States Constitution's Fourth Amendment prohibition on unreasonable searches and seizures.

I held an evidentiary hearing on June 8, 2017, at which the Government called two law enforcement officers to testify.  Notably, the Government did not call Georgia State Patrol Trooper M.S. Allen, the officer who conducted the stop and the search.  Thereafter, the parties filed post-hearing briefs.  [Docs. 40, 44].

I held a hearing for oral argument on these motions on September 19, 2017. At oral argument, I expressed concern about the lack of testimony from Trooper Allen, and I asked whether it would be proper to re-open the evidence to allow the Government to present his testimony.  [Doc. 54].  The Government did not ask to re-open the evidence and chose instead to stand on the record presented at the evidentiary hearing.

On October 16, 2017, I ordered the parties to provide supplemental briefing on the issue that has troubled me since the evidentiary hearing—the lack of evidence in the record about why Trooper Allen decided to stop Defendant's car. [Doc. 55].  The Government and Defendant filed supplemental briefs [Docs. 56, 59], and the motions are now ready for resolution.

## I.      FACTS PRESENTED AT THE EVIDENTIARY HEARING

At the evidentiary hearing, Drug Enforcement Administration ("DEA") Special Agent Sherezad Dunn testified that in 2015, when she was working undercover for the City of East Point Police Department and posing undercover as a drug purchaser named "Jasmine," she had arranged to purchase 3,000 packets of synthetic marijuana from Defendant.  [Tr. 4, 7-10].  Special Agent Dunn set up a meeting for November 9, 2015 between Defendant and a confidential source ("the

CS") at the Sam's Club parking lot on Clairmont Road, in Atlanta, Georgia.[1]  [Tr. 11-12].  The CS was instructed to meet Defendant in the parking lot, determine if Defendant had brought with him the packets of synthetic marijuana, and if so, tell Defendant to drive north on Interstate 85 to another location where Jasmine would be waiting with the money.  [Tr. 12].

Special Agent Dunn testified that before the meeting took place, she had informed the Georgia State Patrol ("GSP") about the investigation.  [Tr. 13-14]. She also had requested that the GSP conduct a traffic stop of Defendant's car after he left the meeting, if Defendant showed up as planned with the drugs.  [Tr. 14, 22-23].  She explained that the DEA routinely asked for this type of assistance from the GSP in order to protect its investigations and confidential sources.  [Tr. 14-15, 22-24].  With respect to the drug deal at issue in this case, she testified that someone from the DEA (she could not remember who) asked GSP "to conduct a traffic stop of Mr. Khan's vehicle, to find their own probable cause to stop the car and carry on with their investigation."  [Tr. 14, 22].  When asked what the GSP would do if it were unable to find its own independent basis for a traffic stop, Special Agent Dunn testified, "then DEA would just say well, we know there's

---

[1]   Defendant first came to law enforcement's attention when the CS informed them that Defendant had offered to provide the CS with some synthetic marijuana samples.

3

suspected synthetic marijuana in the vehicle, you can stop the vehicle, and if that means compromising the investigation at that point, then that's just what happens." [Tr. 15].

On the date of the meeting, November 9, 2015, the DEA and other law enforcement officers set up surveillance in the Sam's Club parking lot. Special Agent Dunn was not present in the parking lot, but other law enforcement officers were there and able to observe the meeting, including Georgia Bureau of Investigation Special Agent Marvin Reid Montgomery, who testified at the evidentiary hearing. [Tr. 13, 21, 28-40]. Special Agent Montgomery testified that he was conducting surveillance at the Sam's Club meeting and taking surveillance photographs from an undercover vehicle. [Tr. 28-29]. The GSP was on the scene as well, although the Government presented no evidence as to which particular troopers or officers were there. [Tr. 24].

Special Agent Montgomery observed Defendant and the CS arrive at the Sam's Club parking lot, and he photographed them talking. [Tr. 29-31]. He watched as the CS appeared to confirm that Defendant had the drug packets in his car. [Tr. 33]. Meanwhile, Special Agent Dunn was listening to a "DEA radio," and through the radio communications, she was aware that Defendant had arrived in the parking lot, that the CS had checked the vehicle, and that the CS had

confirmed that Defendant had the drugs.  [Tr. 13, 21].  After confirming that Defendant had brought the drugs with him, the CS told Defendant to drive north on Interstate 85 to another location, and then both the CS and Defendant got back into their respective vehicles and drove away.  [Tr. 13, 34-35].  When Defendant pulled out of the Sam's Club parking lot, Special Agent Dunn was notified on the radio that Defendant's car was moving.  [Tr. 21-22].  She testified that at that point, "we let GSP know that [Defendant's car] is leaving, we give GSP the go-ahead to do what they need to do."  [Id.].

Shortly after Defendant pulled onto Interstate 85, GSP Trooper M.S. Allen began following Defendant, and approximately a minute and a half later, Trooper Allen pulled over Defendant's car.[2]  [Def. Ex. 1].  Special Agent Dunn was driving behind the GSP cruiser, and when Trooper Allen pulled Defendant over, Special Agent Dunn kept on driving.  [Tr. 16].  She did not observe any traffic infraction. [Tr. 16, 19].  According to Trooper Allen's dash cam recording (both video and audio), Trooper Allen pulled Defendant over and told Defendant that he was

---

[2]   Notably, the Government presented no evidence whatsoever regarding what transpired between Defendant and Trooper Allen.  The record contains no evidence as to what Trooper Allen was doing before he started following Defendant, no evidence about why Trooper Allen pulled Defendant over, and no evidence of any traffic infraction.  It was Defendant who offered the CD containing video and audio from Trooper Allen's dash cam.  [Def. Ex. 1].

5

"weaving a lot within the lane." [Def. Ex. 1]. The recording reflects that a few minutes later, Trooper Allen reported (either by phone or by radio—it is not clear from the recording) that he wanted to "check [Defendant's] mannerisms just based on the way he was driving." [Id.]. Trooper Allen did not say anything at that time about a drug investigation or having instructions from the DEA to search Defendant's car. [Id.]. Another officer in a patrol car then arrived on the scene, and together the two officers escorted Defendant a short distance to an overpass to conduct a sobriety test. [Id.]. At Trooper Allen's instructions, the three cars drove in a line, with the other officer first, followed by Defendant, and Trooper Allen third in the line. [Id.]. While driving to the overpass, Trooper Allen stated to the other officer (either by phone or by radio—it is not clear from the recording) that he did not want to go too far and "risk the way he's driving." [Id.]. Trooper Allen then conducted a sobriety test, which Defendant passed. [Id.]. Nevertheless, the officers did not allow Defendant to leave, but detained him for several more minutes. [Id.].

Approximately twenty minutes after the initial stop, Trooper Allen requested

and obtained consent from Defendant to search Defendant's car.[3]   During the search, the officers found three boxes of suspected synthetic marijuana, which were seized and given to the DEA.  [Def. Ex. 1; Tr. 17, 36].  Defendant was not arrested at that time, but rather was allowed to leave.

As noted above, Trooper Allen did not testify at the evidentiary hearing, and the Government presented no direct evidence to show that Trooper Allen had any knowledge whatsoever about the DEA's undercover investigation or that Trooper Allen was acting on DEA instructions.

## II.   DISCUSSION

Under the Fourth Amendment to the United States Constitution, every search or seizure by a government agent must be reasonable.  See U.S. Const. amend. IV.  Accordingly, a search or seizure must normally be conducted under the authority of a court-issued warrant, supported by a finding of probable cause to believe that evidence of a crime will be found in the targeted location.  See Mincey v. Arizona, 437 U.S. 385, 390 (1978).  Warrantless searches are "per se unreasonable" under the Fourth Amendment, unless they fall into one of a few well-delineated exceptions.  Arizona v. Gant, 556 U.S. 332, 338 (2009); United

---

[3]   The lawyers for both sides agreed that Defendant executed a written consent to search, but neither side made that written consent a part of the evidentiary record.

States v. Campbell, 920 F.2d 793, 795 (11th Cir. 1991) ("A search without a warrant based on probable cause is illegal, unless the government can show that it falls into one of those limited exceptions recognized by law.").

In this case, the Government has elected not to argue that the stop was based on any traffic infraction and has presented no evidence to support such a position. Rather, the Government argues that the stop and search of Defendant's car were authorized by the automobile exception to the warrant requirement.  [Doc. 40 at 9-11].  Under the automobile exception, a vehicle may be stopped and searched without a warrant if there is probable cause to believe the vehicle contains contraband or evidence of a crime: "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more."  Pennsylvania v. Labron, 518 U.S. 938, 940 (1996); see also United States v. Virden, 488 F.3d 1317, 1321-22 (11th Cir. 2007) ("[T]he search and seizure of vehicles without a warrant is permissible when the police have probable cause to believe a vehicle contains contraband.") (citations omitted).  When a search is conducted pursuant to the automobile exception, law enforcement is permitted to "search all parts of the vehicle, and any containers therein, where the object of the search might be found."  United States v. Baldwin, 774 F.3d 711, 720 (11th Cir. 2014).

8

Probable cause for a search exists when, under the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983); United States v. Goddard, 312 F.3d 1360, 1363 (11th Cir. 2002).  In this case, the Government contends that Trooper Allen had probable cause to stop and search Defendant's car because the collective knowledge of all the officers working on the undercover drug investigation can be imputed to him.  The Eleventh Circuit has held that "[p]robable cause exists where the facts and circumstances within the collective knowledge of law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed." United States v. Willis, 759 F.2d 1486, 1494 (11th Cir. 1985) (internal quotation marks omitted). However, the knowledge of the group may be imputed to the officer who conducts the stop and search only if it is shown that the officer "maintained at least a minimal level of communication during [the] investigation." Id. Thus, where, like here, the Government proceeds on a "collective knowledge" theory, the validity of the stop and subsequent search rises and falls on the level of communication between the officer who conducted the stop and the other law enforcement officers who were aware of the facts establishing probable cause.  It is the Government's

burden to establish the application of the automobile exception by a preponderance of the evidence.  See United States v. Freire, 710 F.2d 1515, 1519 (11th Cir. 1983); United States v. Matlock, 415 U.S. 164, 177 n.14, (1974).

The Government argues that it has carried its burden of showing a valid stop because the officers who were working on the case, collectively, had knowledge of facts that rose to the level of probable cause.  At oral argument, the Government pointed to the following facts from which, it contends, the Court can draw an inference that Trooper Allen was operating at the direction of the DEA as part of the law enforcement team investigating Defendant: (1) that the DEA had put the GSP on notice of the drug investigation and the Sam's Club meeting; (2) that the DEA had advised the GSP that there might have been drugs in Defendant's car; (3) that there were radio communications among certain of the officers on the scene of the Sam's Club meeting; and (4) that Trooper Allen, who worked for the GSP, pulled Defendant over just as the DEA had requested.  According to the Government, it was not necessary to put on any direct evidence as to Trooper Allen's knowledge of the investigation or his level of communication with the other officers because the circumstantial evidence supports an inference that he was acting at the DEA's direction when he made the decision to pull Defendant's car over.

Defendant argued at oral argument that in the absence of evidence as to Trooper Allen's actual motives for making the stop, there is insufficient evidence to establish what, if anything, Trooper Allen knew about the investigation or why Trooper Allen decided to pull over Defendant's car.  According to Defendant, the Government's failure to call Trooper Allen as a witness at the evidentiary hearing leads to its own inference, i.e., that Trooper Allen's testimony would not have been helpful to the Government's case.

Having reviewed the evidence in the record and the arguments of counsel, both in their written submissions and at oral argument, I conclude that the Government has failed to carry its burden of showing that the automobile exception to the warrant requirement applies in this case.

The Government could have called a number of witness to demonstrate Trooper Allen's knowledge of the DEA investigation (to the extent he had any), such as Trooper Allen, who could have easily explained his reasons for pulling over Defendant's car; someone from the DEA investigative team or the GSP who may have spoken with Trooper Allen about the investigation; someone who may have heard Trooper Allen respond over the DEA radio channel that he was planning to stop Defendant's car; or the other officer who assisted in the traffic

stop.  The Government called none of these witnesses.[4]  In the absence of evidence about what level of communication  (if any) Trooper Allen had with the DEA team and with his own GSP colleagues who might have known about the investigation, I cannot conclude that the Government has carried its burden.  There is a fatal void in the evidence.

In  its  supplemental  brief,  the  Government  argues  that  it  may  use  either circumstantial  or  direct  evidence  to  meet  its  burden  and  that  circumstantial evidence is legally entitled to the same value as direct evidence.  [Doc. 56 at 3].  It then presents the following facts that it contends are sufficient to meet its burden of

---

[4]   The  Government  has  had  no  fewer  than  three  opportunities  to  either present such testimony or move to reopen the evidence, and it has not done so. The  Government  could  have  presented  such  testimony  during  the  evidentiary hearing.  Then, during oral argument, I suggested that perhaps the evidence should be reopened, but the Government did not ask for that relief.  And most recently, I entered an order on October 16, 2017, indicating that I was troubled by the gap in the evidence, and the Government still did not move to reopen the evidence.  At the  conclusion  of  the  Government's  supplemental  brief,  the  Government  half-heartedly addresses the issue, stating only that the Court may reopen the evidence "if the Court wishes to have additional evidence to review."  [Doc. 56 at 7].  I do not  wish  to  review  any  additional  evidence.   The  Government  has  made  the deliberate,  informed  decision  on  no  less  than  three  occasions  to  proceed  without the  testimony  of  Trooper  Allen  or  other  witnesses  who  might  shed  light  on  the level of communication between Trooper Allen and the DEA investigation team. Both the Court and Defendant have expended a great deal of time and energy researching,  analyzing,  and  addressing  the  Government's  legal  theory  vis  a  vis the  record  evidence  in  this  case.   In  my  view,  the  Government  should  be  made  to stand  by  its  decisions.   If  the  Government  had  seriously  wished  to  supplement  the  record, it should have directly moved to reopen the evidence, but it has never done so.

12

persuasion to show that Trooper Allen was in communication with the DEA and was acting at their direction when he pulled Defendant's car over:

> Prior to the meeting at Sam's Club, GSP was notified of the on-going investigation and the expectation of drugs in Khan's vehicle. (T., pgs. 14-15, 22.) That day, GSP officers were in the area, on stand-by at DEA's request. (Id.) DEA requested GSP's presence for the purpose of conducting a traffic stop after Khan left the Sam's Club parking lot. (Id.) Khan's movements were described over the DEA radio channel. (Id.) GSP officers were given access to that DEA radio channel so they would know when Khan left the area. (Id.) DEA communicated via radio that Khan's vehicle was leaving Sam's Club. (Id.) Within minutes of Khan's departure, GSP Allen located Khan's vehicle on I-85 and conducted a traffic stop, all at the time, place, and manner requested by DEA.

[Doc. 56 at 4-5]. According to the Government, this evidence makes it "more probable than not" that Trooper Allen had at least minimal communication with the DEA and was acting at the DEA's direction. [Id. at 5].

This recitation of the evidence, however, omits the most important evidence before the Court on the question of why Trooper Allen pulled over Defendant's car—the dash cam evidence. The dash cam recording clearly reflects that Trooper Allen pulled over Defendant's car because he thought that Defendant was impaired.

On the dash cam, Trooper Allen first told Defendant that he pulled him over because Defendant was "weaving a lot within the lane." [Def. Ex. 1]. Trooper Allen then reported—apparently outside of the hearing of Defendant—that he

wanted to "check [Defendant's] mannerisms just based on the way he was driving." [Id.].   Trooper Allen did not say anything at that time about a drug investigation or having instructions from the DEA to search Defendant's car. [Id.]. Trooper Allen then decided to conduct a field sobriety test. [Id.].   And then, on the way to the overpass where the sobriety test was to occur, Trooper Allen stated to his colleague—again outside the hearing of Defendant—that he did not want to go too far and "risk the way he's driving." [Id.].   After they reached the overpass, Trooper Allen conducted the sobriety test, which Defendant passed.   [Id.]. Ultimately, Trooper Allen requested consent to search the car. [Id.].

While the Government is correct that it may satisfy its burden of persuasion with only circumstantial evidence, this approach can be risky.  The Government runs the risk that the evidence may support other inferences that are equally likely or more likely.  Here, the dash cam evidence supports an inference that Trooper Allen was not part of the DEA investigation and was not in on the plan to pull Defendant over.   If, as the Government argues, Trooper Allen was merely conducting a sham stop to protect Special Agent Dunn's investigation, it is reasonable to assume that Trooper Allen would have alerted his colleague about the true purpose of the stop and what he expected to find in the car.  Trooper Allen did not do so; in fact, he told his colleague that he was concerned about how

Defendant was driving.  It simply does not make sense that Trooper Allen would lie to his colleague about the purpose of the stop and the potential dangers the situation posed.

Moreover, I note that when asked what the GSP would do if it were acting at the DEA's direction and was unable to find its own independent basis for a traffic stop, Special Agent Dunn testified, "then DEA would just say well, we know there's suspected synthetic marijuana in the vehicle, you can stop the vehicle, and if that means compromising the investigation at that point, then that's just what happens."  [Tr. 15].  Here, the evidence shows that Defendant did not commit an actual actionable traffic violation, meaning that the GSP did not have its own independent basis to search the car.  Trooper Allen did not do as Special Agent Dunn suggested an officer would do if he were unable to find his own independent basis to stop and search a car.  He did not consult with the DEA to get the go-ahead to search the vehicle based on the automobile exception.  Rather, he asked for Defendant's consent to search.  The fact that Trooper Allen asked for consent to search the car is inconsistent with the Government's theory that Trooper Allen knew he had probable cause to search the car from the beginning, and it is consistent with Defendant's theory (that Trooper Allen knew he did not have probable cause to search the car).  Also, if Trooper Allen were really part of the

15

team, it would stand to reason that he would have used the "DEA radio" to alert

someone that he was making the stop.  There is no evidence that anyone from the

GSP, including Trooper Allen, ever said anything on the DEA radio channel about

Defendant.

For the reasons stated, Trooper Allen's words and actions captured on the

dash cam lead to the inference that Defendant was stopped for a suspected traffic

violation, and not because Trooper Allen was part of the DEA investigation or

acting on DEA instructions.  The inference that Defendant was merely stopped for

a suspected traffic violation is exceedingly reasonable, as the GSP stops motorists

on Interstate 85 for suspicion of impairment every day.[5]

At the evidentiary hearing, the Government's two testifying witnesses

testified that they did not speak to Trooper Allen, did not know what Trooper Allen

may (or may not) have heard or been told about the investigation, and did not

---

[5]  Because the Government presented no evidence to support a valid traffic stop, the Government is precluded from proceeding on such a theory.  Indeed, even accepting as true Trooper Allen's statement that Defendant was weaving within the lane, there is insufficient evidence in the record to support a conclusion that the traffic stop was justified based Defendant's driving conduct.  See United States v. Bryson, No. 1:13-CR-09-ODE-GGB, 2013 WL 5739055, at *4 (N.D. Ga. Oct. 21, 2013) (concluding that the mere touching of the lane lines is insufficient by itself to provide a lawful basis for law enforcement to stop a vehicle); United States v. Hernandez, 17 F. Supp. 3d 1255, 1258 (N.D. Ga. 2014) (finding a traffic stop was not justified where the only evidence of a traffic violation was touching the lane lines and there was nothing else to suggest intoxication).

know whether Trooper Allen had a radio in his car that could have picked up (or did, in fact, pick up) the communications among the officers in the parking lot. Special Agent Dunn could not remember who, if anyone, told the GSP to stop Defendant's car, and she did not even know whether Trooper Allen was present at the Sam's Club meeting.  [Tr. 24-25, 35].  Simply put, neither witness had any knowledge about whether Trooper Allen actually was aware of, or had any communications whatsoever regarding, the DEA investigation.

The Government cites to United States v. Davis, 799 F.2d 1490 (11th Cir. 1986) for the proposition that the testimony of Trooper Allen is not necessary for the Government to meet its burden.  In that case, the Eleventh Circuit held that the Government had established that an FBI informant had consented to recorded telephone conversations between himself and the defendant, even in the absence of the informant's testimony.  Id. at 1492.  Davis is distinguishable from the instant case, however, because in Davis, there was "overwhelming circumstantial evidence" showing that the informant consented to the recording.  And, apparently there was no reasonable contrary inference that could be drawn from the evidence presented.  Id.  In this case, however, the evidence in support of the Government's proposed inference is far from overwhelming, and, as discussed above, the evidence supports a contrary reasonable inference.  While I agree with the

17

Government that it is theoretically possible for the Government to carry its burden with only circumstantial evidence of the motive of the officer who conducts the traffic stop, I conclude that in this particular case, the Government failed to meet its burden.

I have been unable to find an Eleventh Circuit opinion on all fours with this case because in most suppression hearings, the officer who conducts the stop testifies at the hearing as to his motives and the circumstances surrounding the stop. What is clear from the case law, however, is that to satisfy the "collective knowledge" standard, there must be some evidence that the officer in question was aware of the investigation at least and some of the facts giving rise to probable cause to conduct the search and/or seizure. Here, the Government has failed to meet that standard. See, e.g., United States v. Wilson, 894 F.2d 1245, 1254 (11th Cir. 1990) (the surveilling officers on the scene advised their supervisor that the defendant's car was moving, and the supervisor then instructed them to stop the vehicle); United States v. Willis, 759 F.2d 1486, 1493 (11th Cir. 1985) (arresting officer arrived on the scene, was "informed . . . of the events," and then arrested the suspects); United States v. Kapperman, 764 F.2d 786, 790 (11th Cir. 1985) (arresting officer in Georgia was part of the surveillance team and confirmed that the defendant was using a false name by speaking with law enforcement officers in

Las Vegas); <u>United States v. Hernandez</u>, 17 F. Supp. 3d 1255, 1260 (N.D. Ga. 2014) (the officers "with knowledge of the investigation" directed another officer, who testified at the hearing that he was aware of the federal investigation, to make the traffic stop); <u>United States v. Olmedo</u>, 552 F. Supp. 2d 1347, 1352 (S.D. Fla. 2008) (concluding that the police officer who made the traffic stop had maintained "more than a minimal level of communication" with the rest of the team where the police officer was in direct contact with the DEA agent supervising the investigation, and had been provided with specific, material details of the DEA's investigation prior to the stop).

I agree with Defendant that while the "minimal level of communication" standard articulated in <u>Willis</u> is not a high bar, to be a standard at all, it requires more than questionable inferences, which is what we have in this case.  In the absence of a showing that Trooper Allen maintained a minimal level of communication with Special Agent Dunn's team, the Government has failed to show that Trooper Allen lawfully stopped Defendant's car.  And, because the Government has not shown that the stop was legal, it has also necessarily failed to show that the subsequent search was legal.

### III.   CONCLUSION

For the foregoing reasons, I recommend that Defendant Ali-Haider Khan's Motion to Suppress the November 9, 2015 Traffic Stop [Doc. 20] and Motion to Suppress the Warrantless Search [Doc. 21] be **GRANTED**.

I have now addressed all referred pretrial matters and have not been advised of any impediments to the scheduling of a trial.   Accordingly, this case is **CERTIFIED READY FOR TRIAL**.

**IT IS SO ORDERED**, this 11th day of December, 2017.

Catherine M. Salinas
United States Magistrate Judge